ALLIANCE FOR COMMUNITY MEDIA;
the Alliance for Communications De-
mocracy; People for the American Way,
Petitioners,

v.

FEDERAL COMMUNICATIONS
COMMISSION; United States
of America, Respondents,

New York Citizens Committee for Respon-
sible Media; Media Access New York;
Brooklyn Producers' Group; David
Channon; National Cable Television As-
sociation, Inc., Intervenors (Two Cases).

DENVER AREA EDUCATIONAL TELE-
COMMUNICATIONS CONSORTIUM;
American Civil Liberties Union, Peti-
tioners,

v.

FEDERAL COMMUNICATIONS
COMMISSION; United States
of America, Respondents.

New York Citizens Committee for Respon-
sible Media; Media Access New York;
Brooklyn Producers' Group; David
Channon; National Cable Television As-
sociation, Inc., Intervenors,

Morality in Media, Amicus Curiae.

AMERICAN CIVIL LIBERTIES
UNION, Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION; United States
of America, Respondents,

New York Citizens Committee for Respon-
sible Media; Media Access New York;
Brooklyn Producers' Group; David
Channon; National Cable Television As-
sociation, Inc., Intervenors,

National Law Center for Children
and Families; National Legal
Foundation, Amici Curiae.

Nos. 93–1169, 93–1171, 93–
1270 and 93–1276.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 14, 1993.

Decided Nov. 23, 1993.

Rehearing Denied; Rehearing In Banc
Granted, Judgment Vacated Feb.
16, 1994.*

* Editor's Note: The court's Feb. 16, 1994 order will be published. See 1994 WL 50429.

I. Michael Greenberger, argued the cause for petitioners in Nos. 93–1169, 93–1171, 93–1270 and 93–1276. With him on the joint briefs were Charles S. Sims, Marjorie Heins, Lisolette E. Mitz, Arthur Barry Spitzer, James Ned Horwood, Andrew Jay Schwartzman and Elliot M. Mincberg. Michael Kenneth Isenman was on the brief for petitioners the Alliance for Communications Democracy and People for the American Way in No. 93–1270.

Gregory M. Christopher, Counsel, F.C.C., argued the cause for respondents. With him on the brief were Renee Licht, Acting Gen. Counsel, F.C.C., Daniel McMullen Armstrong, Associate Gen. Counsel, F.C.C., Stuart E. Schiffer, Acting Asst. Atty. Gen., U.S. Dept. of Justice, Barbara L. Herwig and Jacob M. Lewis, Attys., U.S. Dept. of Justice.

On the brief for intervenor Nat. Cable Television Ass'n, Inc., were Daniel Leslie Brenner, Michael Stuart Schooler and Diane B. Burstein.

On the joint brief for amicus curiae Nat. Law Center for Children and Families and Nat. Family Legal Foundation, were H. Robert Showers, Jr., and James P. Mueller.

Robert Thomas Perry, entered an appearance for intervenors New York Citizens Committee for Responsible Media, Media Access New York, Brooklyn Producers' Group and David Channon.

Paul J. McGeady, entered an appearance for amicus curiae Morality in Media in No. 93–1171.

Before MIKVA, Chief Judge, WALD and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Petitioners, a group of cable programmers and organizations of listeners and viewers, seek review of two orders issued by the Federal Communications Commission ("FCC" or "Commission") regulating indecent programming on cable "access" channels. Access channels are those channels a cable operator must set aside for public, educational, or governmental use ("PEG access") or use by unaffiliated commercial programmers ("leased access").[1] We examine two constitutional questions: First, when the government compels private cable operators to relinquish editorial control over a certain number of "access" channels, making these available for general use by unaffiliated programmers, may it permit cable operators to deny access on those channels to programs that are "indecent," as defined by the FCC? Second, if the cable operator does not ban "indecent" programs from leased access channels, may the government compel the cable operators to place on a separate channel all leased access programs that the pro-

---

**1.** *In re Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992*, 7 F.C.C.R. 7709 (1992) (notice of proposed rulemaking); 8 F.C.C.R. 998 (1993) (first report and order); 8 F.C.C.R. 2638 (1993) (second re-

port and order). These orders were issued pursuant to section 10 of the Cable Television Consumer Protection and Competition Act of 1992, Pub.L. No. 102–385, § 10, 106 Stat. 1460.

grammer, as required by law, has identified as "indecent," and to block such channel until the subscriber requests in writing that the block be lifted? As to the first question, we hold that not only does the First Amendment prohibit the government from banning all indecent speech from access channels, it also prevents the government from deputizing cable operators with the power to effect such a ban. As to the second question, in view of the constitutional problems of underinclusiveness presented by the total lack of regulation of indecent programming on commercial cable channels, we decline at this juncture to rule definitively on the constitutionality of the blocked access channel without permitting the Commission to cure the underinclusiveness of the regulations or to justify adequately its regulatory approach apart from the operator ban.

## I. BACKGROUND

When Congress passed the Cable Communications Policy Act of 1984, Pub.L. No. 98–549, 98 Stat. 2779 ("1984 Act"), it sought, among other things, to "assure that cable communications provide ... the widest possible diversity of information sources and services to the public." 47 U.S.C. § 521. To achieve this goal, the 1984 Act required cable operators to set aside "leased access" channels for commercial use by any entity not affiliated with the cable operator. *Id.* at § 532(b). It further authorized franchising authorities to require cable operators to provide "PEG access" channels for public, educational and governmental use. *Id.* at § 531. Because the 1984 Act barred cable operators from exercising any editorial control over either type of access channels, *id.* at §§ 531(e), 532(c)(2) (amended 1992), it granted cable operators immunity from liability for any access channel programming, *id.* at § 558 (amended 1992).

The House Report on the 1984 Act conceived of access channels as "the video equivalent of the speaker's soap box or the electronic parallel to the printed leaflet." H.R.Rep. No. 934, 98th Cong., 2d Sess. 30 (1984), U.S.Code Cong. & Admin.News 1984, pp. 4655, 4667. As such, Congress embraced access channels as a way to "provide groups and individuals who generally have not had access to the electronic media with the opportunity to become sources of information in the electronic marketplace of ideas." *Id.* However, the statute did not grant leased or PEG access to material unprotected by the Constitution. 47 U.S.C. §§ 532(h), 544(d) (amended 1992). In addition, Congress required cable operators to provide subscribers with a "lock-box" that would allow an adult to "prohibit viewing of a particular cable service during periods selected by that subscriber." *Id.* at § 544(d)(2)(A).

In 1992 Congress enacted the Cable Television Consumer Protection and Competition Act of 1992, Pub.L. No. 102–385, 106 Stat. 1460 (to be codified at 47 U.S.C. §§ 531, 532(h), 532(j) & 558) ("1992 Act" or "Act"). Section 10 of the Act ("section 10") worked two changes, now being challenged before this court. First, it permits a cable operator to prohibit indecent programming on all access channels. Pub.L. No. 102–385, § 10(a) & (c), 106 Stat. at 1486. Second, it compels those cable operators who do not bar indecent programming on leased channels to place such material on separate channels that the subscriber can only view by prior written request. *Id.* at § 10(b). In detail, the 1992 Act gives cable operators the authority to refuse leased access to what they reasonably perceive to be indecent programming. *Id.* at § 10(a). It also requires the FCC to promulgate regulations with respect to leased access channels "requiring cable operators [who do not exercise their authority to refuse access to 'indecent material'] to place on a single channel all indecent programs, as identified by program providers." *Id.* at § 10(b). This channel must be blocked unless the subscriber requests access to the channel in writing. *Id.* The Act requires the FCC to promulgate regulations with respect to PEG channels, allowing the cable operator to prohibit "any programming which contains obscene material, sexually explicit conduct, or material soliciting or promoting unlawful conduct." *Id.* at § 10(c). Finally, it removes cable operators' immunity from liability for access programming insofar as it "involves obscene material." *Id.* at § 10(d).

In late 1992 the Commission commenced informal rulemaking which resulted in the rules at issue in this case. *In re Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992*, 7 F.C.C.R. 7709 (1992) (notice of proposed rulemaking); 8 F.C.C.R. 998 (1993) (first report and order) [hereinafter: *"First Report and Order"*]; 8 F.C.C.R. 2638 (1993) (second report and order). The implementing regulations largely track the statute. With respect to leased access they allow the cable operator to "prohibit[ ] any programming which it reasonably believes" is indecent; require programmers to identify any part of their own programming they consider indecent (failure of which would allow the cable operator to deny access); and require the cable operator either to keep such programming from being transmitted or to place all such programming on blocked channels to which the subscriber can request access in writing. *Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992*, 58 Fed.Reg. 7990, 7993 (1993) (to be codified at 47 C.F.R. § 76.701). With respect to PEG access, the regulations permit a cable operator to "prohibit ... any programming which contains obscene material, indecent material ..., or material soliciting or promoting unlawful conduct[, *i.e.*] ... material that is otherwise proscribed by law," and authorize cable operators to require programmers to certify that their programs do not contain any material in these categories. *Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992*, 58 Fed.Reg. 19,623, 19,626 (1993) (to be codified at 47 C.F.R. § 76.702).

The regulations have been stayed pending review, and the petitions for review have been expedited and consolidated. *Alliance for Community Media v. FCC*, Nos. 93–1270 & 93–1276 (D.C.Cir. May 7, 1993) (order filed); *Alliance for Community Media v. FCC*, Nos. 93–1169 & 93–1171 (D.C.Cir. April 7, 1993) (order filed). Petitioners challenge section 10 of the 1992 Act and the FCC's implementing rules principally on the basis that they violate the First Amendment and the equal protection component of the Fifth Amendment.[2]

## II. ANALYSIS

Petitioners charge that both the authorizing provisions of section 10 and the FCC's implementing regulations (i) are not the least restrictive means to further the government's asserted interest, (ii) impermissibly regulate indecency only on access channels, (iii) will chill protected expression, and (iv) impose a prior restraint on speech without the constitutionally required procedural protections. We distill from this two constitutional questions.

First, when the government requires cable operators to set aside access channels for general use on a content-neutral basis, may it constitutionally permit cable operators to ban indecent material from these channels? The government responds that it may, maintaining that any resulting ban of indecent material from access channels would reflect the editorial judgment of private cable operators to whom First and Fifth Amendment strictures do not apply. For reasons set forth below, we reject the government's argument. Relying on our prior ruling in *Action for Children's Television v. FCC*, 932 F.2d 1504 (D.C.Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1281, 117 L.Ed.2d 507 (1992) (*"ACT II"*), we hold that the government may not constitutionally authorize a cable operator to ban indecent material from access channels.

---

**2.** In addition, petitioners claim that the FCC changed its position from an earlier reliance on the efficacy of content-neutral lockboxes to the adoption of the more restrictive rules at issue here, and that this change in agency position violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706. Joint Brief for Petitioners at 24, 33. Petitioners' reliance on the APA, however, is misplaced, because Congress has intervened and mandated the more restrictive alternative adopted by the Commission. *See,* *e.g., INS v. Chadha*, 462 U.S. 919, 955, 103 S.Ct. 2764, 2786, 77 L.Ed.2d 317 (1983) (Congress may "legislatively alter[ ] or revoke[ ]" its "delegation of authority" (footnote omitted)). Congress' decisions are exempt from the requirements of the APA. 5 U.S.C. § 551(1). To require an agency to justify its change in position taken at the express direction of Congress would be tantamount to subjecting the legislative decision itself to the APA.

■ Second, if cable operators do not exercise their authority to ban indecent material from *leased access* channels, may the government constitutionally require cable operators to segregate and block indecent material on those channels? Since we hold that the authorization of a complete ban on indecent material from access channels is unconstitutional, we must examine the constitutionality of a segregation and blocking requirement on leased access channels on its own. This in turn requires us to focus on the question of whether the statute and the FCC's implementing regulations impermissibly single out leased access channels for the imposition of a segregation and blocking requirement of indecent programming, while leaving commercial channels and (as a consequence of our decision) PEG channels wholly unregulated, *i.e.*, we must focus on the underinclusiveness of the leased channel blocking device. When the Congress and the Commission originally considered the blocked channel mechanism, they each did so in a context that presented some symmetry between PEG access, leased access, and commercial channels, due to cable operators' authority to exclude indecent material on all three types of channels. Because we hold today that authorizing cable operators to ban indecent material from both PEG and leased access channels is unconstitutional, the remaining part of the regulation singles out leased access programmers for restrictions far more conspicuously than did Congress when it enacted section 10. As a

result, we think it prudential to remand the case to the FCC so that it may consider the legality and/or desirability of the blocked channel device applied to leased access channels only. As a prelude to our analysis, we reiterate that indecent speech, as distinct from obscene speech, is protected by the Constitution. *See Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989) (striking down ban on indecent telephone messages); *Action for Children's Television v. FCC*, 852 F.2d 1332, 1340 (D.C.Cir.1988) ("*ACT I*").[3]

A. *Section 10's Authorization of Cable Operators to Ban Indecent Programming From Leased Access and PEG Access Channels*

■ We examine first whether the statute and regulations trigger First and Fifth Amendment scrutiny. The constitutional guarantees of free speech and equal protection of the laws protect against incursion of these liberties by the government but not by private persons. *Hudgens v. NLRB*, 424 U.S. 507, 513, 96 S.Ct. 1029, 1033, 47 L.Ed.2d 196 (1976) (free speech); *Public Utils. Comm'n v. Pollak*, 343 U.S. 451, 461, 72 S.Ct. 813, 820, 96 L.Ed. 1068 (1952) (free speech and equal protection); *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) (equal protection). The government argues that the parts of the regulations authorizing cable operators to deny access to indecent

3. In *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), the Supreme Court announced a three-part test for determining whether material is "obscene," and therefore unprotected by the First Amendment: "(a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable ... law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Id.* at 24, 93 S.Ct. at 2614 (internal quotes and citations omitted). Thus, for example, "[p]atently offensive representations or descriptions of ultimate sexual acts, ... masturbation, excretory functions, and lewd exhibition of the genitals" could be considered obscene, unless they had "serious literary, artistic, political, or scientific value." *Id.* at 25–26, 93 S.Ct. at 2615–16. The Court in *Miller* thus essentially "iso-

late[d] 'hard core' pornography from expression protected by the First Amendment." *Id.* at 29, 93 S.Ct. at 2617.

The FCC, on the other hand, defines "indecent" material as material "that describes or depicts sexual or excretory activities or organs in a patently offensive manner as measured by contemporary community standards for the cable medium." *Implementation of Section 10*, 58 Fed. Reg. at 7993 (to be codified at 47 C.F.R. § 76.-701(g)). It would therefore include in its sweep material that does not appeal to the prurient interest or that taken as a whole may be of the highest literary, artistic, political, or scientific value. For example, a truly scientific program— not merely a pretext for showing material that appeals to the prurient interest—that discusses the prevention of life-threatening diseases through the use of condoms could perhaps be considered "indecent" but would hardly seem to lack the scientific or social value so as to lose protection under the First Amendment.

material do not trigger First or Fifth Amendment analysis because a private cable operator—not the government—would be denying access to indecent material. *See, e.g.,* Respondents' Brief at 16. However, even where it is the decision of a private person which ultimately triggers the abridgment of speech, or effects the challenged discrimination, the state may nevertheless be held responsible if it significantly encouraged the private actor to commit the infringement. *See, e.g., Franz v. United States,* 707 F.2d 582, 592 n. 38 (D.C.Cir.1983) (holding government's encouragement through witness protection program of mother's decision to keep children from father constituted state action). We hold that section 10 significantly encourages the cable operator to ban indecent material, and that the cable operator's ban thus constitutes "state action." [4] As such, it is subject to the same constitutional limitations as those directly constraining the government. In reaching this conclusion, we rely on the Supreme Court's state action doctrine and take specific guidance from *Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), a state action case involving government encouragement of private decisions to discriminate based on race.

1. *State Action in Cable Operators' Decision to Ban Indecent Material from Leased Access and PEG Access Channels*

The Supreme Court has not yet devised an infallible test for determining when actions of private parties are so intertwined with governmental action as to be attributable to the government for purposes of a constitutional inquiry. The determination of whether state action exists in such cases is generally the result of a complicated and fact-specific inquiry. "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 81

S.Ct. 856, 6 L.Ed.2d 45 (1961). Nevertheless, the Supreme Court has found state action to inhere in a variety of situations in which the constitutional violation is ultimately the result of a private decision. *See generally* 2 RONALD D. ROTUNDA & JOHN E. NOWAK, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE, § 16 (2D ED.1992).

We start with the proposition that a state's general regulation of a private industry is insufficient in itself to establish state action. Even if the state confers a license or monopoly power upon a private entity, no state action will be found unless the state is specifically involved in the action being challenged. *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). The Supreme Court has explained that "the inquiry must be whether there is a sufficiently close nexus between the State and the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson,* 419 U.S. at 351, 95 S.Ct. at 453 (citation omitted). *See Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982). The government may, however, be held responsible for the decision of a private party if it has "provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government]." *Blum,* 457 U.S. at 1004, 102 S.Ct. at 2785. *See Rendell–Baker v. Kohn,* 457 U.S. 830, 840, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418 (1982) (quoting *Blum,* 457 U.S. at 1004, 102 S.Ct. at 2785); *Jackson,* 419 U.S. at 357, 95 S.Ct. at 456 (noting government did not place "imprimatur" on private action); *id.* at 357–58 & n. 17, 95 S.Ct. at 457 (noting absence of overt or covert encouragement by government); *accord Franz v. United States,* 707 F.2d 582, 592 n. 38 (D.C.Cir.1983).[5] The issue, then, for us is whether by statute or regulation the government has significantly

---

4. We follow the general usage of the phrase "state action" as encompassing federal, state, or local government action. *See* 2 RONALD D. ROTUNDA & JOHN E. NOWAK, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE § 16.1, at p. 524 (2D ED.1992).

5. In *Franz,* we noted that the single most reliable indicator of state action is "significant governmental promotion of the specific conduct." *Franz,* 707 F.2d at 592 n. 38.

encouraged private cable operators to ban indecent material from access channels.

 Under the statute and regulations governing cable television, the cable operator is relieved of all editorial control over access channels, 47 U.S.C. §§ 531(e), 532(c)(2) (amended 1992), except in the case of constitutionally protected "indecent" material, as defined by the government. By granting the cable operators this exceptional authority to ban indecent material totally from access channels, the government expressly furthers an announced policy to limit children's access to such material. 1992 Act, § 10, 106 Stat. at 1486 (entitled "Children's Protection From Indecent Programming on Leased Access Channels").[6] In promotion of that policy, the government requires leased access programmers to identify any of their programming that contains indecent material, *Implementation of Section 10*, 58 Fed.Reg. at 7993 (to be codified at § 76.701(d)-(f)), and permits cable operators to require PEG access programmers to identify any of their programs containing indecent material. *Implementation of Section 10*, 58 Fed.Reg. at 19626 (to be codified at § 76.702). Moreover, the government defines what constitutes "indecent" material, 1992 Act, § 10(a) & (b), 106 Stat. at 1486,[7] and will step in to resolve certain disputes surrounding the administration of that standard, *First Report and Order*, 8 F.C.C.R. at 1010 ¶¶ 73–75.

The government argues nonetheless that, under the regulations, the cable operator is ultimately free to decide whether or not to deny access to indecent programming. The government maintains that with respect to access channels the 1992 Act simply restores to cable operators a measure of the editorial control they enjoyed prior to the 1984 Act.

We do not find that argument convincing. The Supreme Court has consistently held the government responsible for discrimination that it significantly encourages and has refused to allow it to encourage discrimination on the part of private actors on grounds that it could not itself invoke. *Reitman v. Mulkey*, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967).

In *Reitman*, a private property owner refused to rent an apartment to a couple based on race. He justified his action by citing to a state constitutional amendment establishing the right to discriminate in housing, which implicitly repealed earlier fair housing statutes. The United States Supreme Court affirmed the state supreme court's decision striking down the state amendment as violative of the Fourteenth Amendment, on the ground that "a prohibited state involvement could be found even where the state can be charged with only encouraging, rather than commanding discrimination." 387 U.S. at 375, 87 S.Ct. at 1631 (internal quotes omitted). It approved the state court's decision which "quite properly" examined the amendment in "terms of its 'immediate objective,' its 'ultimate effect' and its 'historical context and the conditions existing prior to its enactment.'" *Id.* at 373, 87 S.Ct. at 1630 (quoting state supreme court). In *Reitman*, the Supreme Court rejected the argument that the amendment merely restored the power to discriminate that private property owners had enjoyed prior to the fair housing amendments. Instead, the Supreme Court upheld the state court's finding of state action and invalidation of the amendment based on an assessment that the amendment "was intended to authorize, and does authorize, racial discrimination in the housing market[; that

6. Although the title of section 10 of the 1992 Act refers only to leased access channels, section 10 also includes the provisions concerning indecent programming on PEG access channels. 1992 Act, § 10(c), 106 Stat. at 1486.

7. Section 10(a) authorizes the cable operator to prohibit leased access programming that "the cable operator reasonably believes describes or depicts sexual or excretory activities or organs in a patently offensive manner as measured by contemporary community standards." 1992 Act, § 10(a)(2), 106 Stat. at 1486. Section 10(b)'s blocking requirement defers to the FCC's definition of "indecent" material, *id.* at § 10(b), as material "that describes or depicts sexual or excretory activities or organs in a patently offensive manner as measured by contemporary community standards for the cable medium." *Implementation of Section 10*, 58 Fed.Reg. at 7993 (to be codified at 47 C.F.R. § 76.701(g)). The Commission also applies the same definition of "indecent" material when regulating PEG access channels. *Implementation of Section 10*, 58 Fed. Reg. at 19,626 (to be codified at 47 C.F.R. § 76.702).

t]he right to discriminate is now one of the basic policies of the State ... [and that] the section will significantly encourage and involve the State in private discriminations." *Id.* at 381, 87 S.Ct. at 1634. Taking guidance from *Reitman,* we examine the regulatory scheme before us in terms of (a) its immediate objective, (b) the context in which the specific authorization to ban indecent material was issued, and (c) the regulations' ultimate effect.[8]

### a. *The Immediate Objective of the Regulations*

. There can be no doubt that the immediate objective of the 1992 Act is to suppress indecent material and limit its transmission on access channels, a purpose the government admits raises First Amendment concerns should state action be present.[9] The government argues before this court and section 10 itself states that the purpose of the regulation is to limit children's access to indecent material. 1992 Act, § 10, 106 Stat. at 1486.

### b. *The Context of the Regulations*

The context of the regulations evinces an effort on the part of the government to enlist the cable operator in the suppression of indecent material. The government focuses the cable operator's attention on the only material the government seeks to suppress, and then permits the cable operator expressly to suppress that—and no other—material.

First, the regulations facilitate the identification of material the government wishes to suppress. In the case of leased access the regulations require cable programmers to identify indecent material contained in their programs, *Implementation of Section 10,* 58 Fed.Reg. at 7993 (to be codified at 47 C.F.R. § 76.701(d)–(f)), and in the case of PEG access the regulations expressly permit the cable operator to require such identification, *Implementation of Section 10,* 58 Fed.Reg. at 19,626 (to be codified at 47 C.F.R. § 76.-702). These requirements of identification apply only with respect to the government-defined material. 58 Fed.Reg. at 7993, 19,-626.

Next, the government has stripped the cable operator of any editorial control over cable access channels except for program-

---

**8.** Unlike the case before us, *Reitman* involved an amendment to the state constitution that also banned future enactment of fair housing laws without an additional amendment of the state constitution. *See Hunter v. Erickson,* 393 U.S. 385, 389, 89 S.Ct. 557, 559, 21 L.Ed.2d 616 (1969). The 1992 Act, of course, could be changed by simple legislation. That difference, however, is not critical in our reasoning. While *Reitman* notes that the right to discriminate "was now embodied in the State's basic charter, immune from legislative, executive, or judicial regulation at any level of the state government," 387 U.S. at 377, 87 S.Ct. at 1632, it clearly did not rely on this fact for its basic reasoning, nor was its reasoning limited to·the constitutional amendment context, as evidenced by its discussion of *McCabe v. Atchison, T. & S.F. Ry.,* 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169 (1914). In *McCabe* the Supreme Court dealt with a statute that required segregation of races in railway cars and, as construed by the Court, also permitted carriers to provide cars for whites only but not for blacks. 235 U.S. at 161, 35 S.Ct. at 71. The *Reitman* Court said that the *McCabe* "Court made it clear that such a statute was invalid under the Fourteenth Amendment because a carrier refusing equal service to Negroes would be 'acting in the matter under the authority of a state law.'" *Reitman,* 387 U.S. at 379, 87 S.Ct. at 1633 (quoting *McCabe,* 235 U.S. at 161–62, 35 S.Ct. at 71). *Reitman* continued, "[t]his was nothing less than considering a permissive state statute as an au-

thorization to discriminate and as sufficient state action to violate the Fourteenth Amendment in the context of that case." *Id.* Whether derived from a statute or a constitutional amendment, significant encouragement by the state of specific private acts suffices for a finding of state action. Such a finding depends upon the context surrounding the state's encouragement, not upon its technical status as constitutional amendment, statute, or administrative regulation.

We also decline to limit *Reitman* to the context of racial discrimination in violation of the Fourteenth Amendment. State action principles developed in the area of racial discrimination are not *sui generis.* Courts have frequently drawn on race discrimination cases for state action principles and applied them in other areas of the law. *See, e.g., Jackson,* 419 U.S. 345, 95 S.Ct. 449 (deprivation of property without due process of law), *Blum,* 457 U.S. 991, 102 S.Ct. 2777 (denial of hearing prior to skilled nursing facilities' discharge or transfer of Medicaid patients), *Franz,* 707 F.2d at 590–94 (government's involvement in denial of husband's access to his children due to wife's membership in witness protection program).

**9.** Indeed, the government's counsel conceded at oral argument that if the court finds state action, the government loses on the validity of that part of the regulations permitting the prohibition of all access to indecent programs.

ming the government wishes to suppress. This aspect of the regulations persuades us to reject the government's reliance on three cases in which courts found no state action present in telephone companies' suppression of indecent messages furnished by message providers. *See Information Providers' Coalition for Defense of the First Amendment v. FCC,* 928 F.2d 866 (9th Cir.1991) (finding no state action in carrier's compliance with governmental requirement to block indecent messages until adult customer requests block to be lifted); *Dial Info. Servs. Corp. of N.Y. v. Thornburgh,* 938 F.2d 1535 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 966, 117 L.Ed.2d 132 (1992) (same); *Carlin Communications, Inc. v. Mountain States Tel. & Tel. Co.,* 827 F.2d 1291 (9th Cir.1987), *cert. denied,* 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988) (finding no state action in carrier's refusal to place any indecent messages on its message network where governmental prohibition was only directed at obscene material). At issue in each of these cases, were only those messages for which telephone companies would collect the fees from customers on behalf of the message providers. Messages for which the carrier did not provide these "billing services" could, in each of the three cases, be transmitted freely. Moreover, the carrier was under no governmental obligation to provide billing services to any message provider. These cases held that governmental regulation of messages for which carriers voluntarily provided billing services was insufficient to convert the private action at issue into state action. *See Information Providers',* 928 F.2d at 877; *Carlin,* 827 F.2d at 1293, 1295, 1297 [10]; *Dial Info.,* 938 F.2d at 1543. We read the absence of state action in the telephone context to derive from the absence of

any governmental coercion to provide billing services for message providers. In the case before us, on the other hand, the government *is* compelling the cable operator generally to accept all programming for leased and PEG access channels on a content-neutral basis, but allows the cable operator to refuse that access when the message is indecent. If access to a cable channel serves as the parallel to billing services in the telephone cases, there is, in our case, indeed a compulsion to provide the service generally, *i.e.,* on a content-neutral basis for nonindecent material. The government's involvement in the case before us is consequently far greater than in the telephone cases because the government permits no editorial control over cable access channels except when indecent material is involved. In this case, the cable operator must rely on section 10 of the Act and the contested regulations for authority to ban indecent programming, because the government does not permit the cable operator to refuse to carry a programmer's constitutionally protected speech for any other reason.[11] *Cf. Reitman,* 387 U.S. 369, 87 S.Ct. 1627.

To sum up, the government first strips a cable operator of editorial power over access channels, then singles out the material it wishes to eliminate, and finally permits the cable operator to pull the trigger on that material only.[12]

c. *The Ultimate Effect of the Regulations*

■ The ultimate effect of this banning authorization is hardly in doubt; the legislative history indicates that many cable operators will eagerly ban indecent programming. *See* S. Rep. No. 92, 102d Cong., 1st Sess. 31

---

**10.** The significance of the fact that the carrier in *Carlin* was voluntarily providing billing services to message providers is somewhat buried in the case, but nevertheless obvious. While the *Carlin* court assumes that the telephone company must offer its service to all alike without discrimination, 827 F.2d at 1293, it rejects the idea that the carrier must provide access to its "976 network" on a content-neutral basis, *id.* at 1295, *i.e.,* access to the 976 network, which is the carrier's billing services network, *id.* at 1293, is entirely voluntary, *e.g., id.* at 1297.

**11.** Of course the regulations also permit the cable operator to ban "material that is otherwise proscribed by law." *Implementation of Section 10,* 58 Fed.Reg. at 19,626. For state action purposes the same analysis applies to the cable operator's editorial power over this type of material.

**12.** The context of the case before us presents an even stronger case for state action than that in *Reitman* where the amendment left the property owner free to discriminate on any grounds he chose.

(1991).[13] Under the statute and regulations, the cable operators have no incentive whatsoever to allow indecent access programmers onto leased access or PEG access channels. Of course the very reason for mandating access in 1984 and for continuing to mandate access of nonindecent material in 1992 was that unaffiliated programmers are *unable* to gain access to regular, commercial cable channels. A cable programmer seeks access to either leased or PEG access channels precisely because a mutually agreeable arrangement to transmit the program on regular commercial channels cannot be reached. *See id.* Indeed, the Act even regulates the rates that a cable operator may charge a programmer for transmission on leased access channels precisely because cable operators have traditionally priced leased access out of the range of many programmers. *See* 1992 Act, § 9, 106 Stat. at 1484; S. REP. No. 92, 102d Cong., 2nd Sess. 31. For all these reasons, the government can confidently rely on cable operators to grasp the opportunity to ban certain kinds of leased and PEG access programming if they are permitted to do so. In that respect, the regulations appear as "a form of sophisticated discrimination whereby the [government] ... harness[es] the energies of private groups to do indirectly what [it] cannot [constitutionally] ... do [itself]." *Reitman,* 387 U.S. at 383, 87 S.Ct. at 1635 (Douglas, J., concurring) (footnotes omitted).

We conclude therefore from the immediate regulatory objective, its context, and its ultimate effect, that the total denial of access for indecent material authorized under the statute and implementing regulations constitutes state action and is therefore subject to the same constitutional restrictions that constrain the government if it were to enforce such a ban directly.[14]

### 2. *Indecent Speech and the First Amendment*

■ Indecent, nonobscene language is protected by the First Amendment, but is not immune from regulation. *Sable Communications of Cal., Inc. v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989) (striking down total ban on 'indecent' commercial telephone messages); *ACT I,* 852 F.2d 1332, 1340 (D.C.Cir.1988). Reasonable time, place or manner restrictions on speech may be imposed, but where a statute regulates speech "in terms of subject matter[, t]he regulation '... slip[s] from the neutrality of time, place, and circumstance into a concern about content.'" *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 99, 92 S.Ct. 2286, 2292, 33 L.Ed.2d 212 (1972) (quoting Harry Kalven, Jr., *The Concept of the Public Forum:* Cox v. Louisiana, 1965 SUP.CT.REV. 29). *See Pacific Gas & Elec. Co. v. Public Utils. Comm'n of Cal.,* 475 U.S. 1, 20, 106 S.Ct. 903, 913, 89 L.Ed.2d 1 (1986); *Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.,* 447 U.S. 530, 536, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980); *ACT I,* 852 F.2d at 1343 n. 18. Because section 10 expressly regulates access programming on

---

**13.** The fact that cable operators willingly follow the government's encouragement does not immunize the government from taking responsibility for those actions. *See Peterson v. City of Greenville,* 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963) (regardless of actual motivation of private party, government must take responsibility for result it commands); *accord Carlin,* 827 F.2d at 1295. To the contrary, *Reitman* illustrates that the government's reliance on the willing compliance of private citizens is a factor increasing—not diminishing—the government's involvement. *See, e.g., Reitman,* 387 U.S. at 381–87, 87 S.Ct. at 1634–37 (Douglas, J., concurring).

**14.** In the case of leased access, *Robinson v. Florida,* 378 U.S. 153, 84 S.Ct. 1693, 12 L.Ed.2d 771 (1964), further supports our conclusion that state action attaches to the actions of a cable operator who must either ban indecent material or segregate and block such material. *Robinson* signals that if a state imposes considerable enough burdens on one of a private actor's alternative choices, the private party's choice of the less burdensome alternative will be fairly attributable to the state. In that case, a restaurant owner who refused to serve blacks had called the police to remove a racially mixed group. A state regulation required racially segregated lavatory facilities "where colored persons are employed or accommodated." 378 U.S. at 156, 84 S.Ct. at 1695 (internal quotes and citation omitted). This burden on restaurants serving customers of both races was sufficient to implicate the state in a private restaurant's refusal to serve blacks altogether. The Court held that the burden imposed by the regulation on serving customers of both races evidenced that the trespass convictions were more than the result of a purely private decision to discriminate, and so reflected "state policy." *Id.* at 156–57, 84 S.Ct. at 1695.

the basis of whether it contains indecent material, it must be treated as a content-based restriction and cannot be considered a constitutionally permissible time, place, or manner regulation. Although content-based regulations "presumptively violate the First Amendment," *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46–47, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986), the government "may ... [, nevertheless] regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest," *Sable*, 492 U.S. at 126, 109 S.Ct. at 2836. *See Consolidated Edison*, 447 U.S. at 540, 100 S.Ct. at 2334; *ACT I*, 852 F.2d at 1343 n. 18.

### 3. Least Restrictive Means

 The government's interest in "limiting the access of children to indecent programming," 1992 Act, § 10(b), 106 Stat. at 1486, has been recognized as a compelling interest. *FCC v. Pacifica Found.*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (upholding FCC's ruling that broadcasting of indecent program in mid-afternoon was in violation of indecency prohibition); *Dial Info.*, 938 F.2d at 1541. While we acknowledge for purposes of this analysis the importance of this interest, we are unpersuaded that the authorization of a ban on indecent material presents the least restrictive means of furthering the asserted interest.[15] The government quite candidly admitted at argument that if a cable operator's ban of indecent programming from access channels constitutes state action, that ban is unconstitutional. The total denial of access based solely on the fact that the content of the protected speech is "indecent" raises the specter of "reduc[ing] the adult population ... [to receiving] only what is fit for children" by permitting and encouraging the cable opera-

tor to do just that. *Butler v. Michigan,* 352 U.S. 380, 383, 77 S.Ct. 524, 525, 1 L.Ed.2d 412 (1957). *See Sable,* 492 U.S. at 127–31, 109 S.Ct. at 2836–39; *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (striking down prohibition on mailing of unsolicited advertisements for contraceptives).

This court held in *ACT II,* 932 F.2d 1504 (D.C.Cir.1991), that in attempting to regulate indecency in broadcasting, Congress could not constitutionally enact a complete ban. *Id.* at 1509. We found in that case that the Constitution required some safe harbor period during which "indecent" material may be broadcast. *Id.* We have been presented with no evidence why the context of cable television should command a different conclusion. The government has not advanced any reason why its interest in limiting children's access to indecent material is substantially impugned by providing some safe harbor during which indecent material may be transmitted on the cable network. Nor has it convincingly shown that a variety of less drastic restrictions on indecent programming short of a total ban are ineffective.

The fact that a total ban on indecent programming is not the least restrictive alternative in the case of cable is recognized in the terms of the Act itself. Section 10 of the Act provides the cable operator with the choice of a patently less restrictive means to further the government's interest. The cable operator may transmit indecent material if it places such programming on a separate channel which can only be viewed at the subscriber's express request. 1992 Act, § 10(b), 106 Stat. at 1486. Since Congress has itself judged a channel-block to be an adequate means of furthering its compelling interest, it may not be heard to argue that authorization of a complete ban by cable operators is the only effective means of fur-

**15.** *Amici Curiae,* Morality in Media, the National Family Legal Foundation and the National Law Center for Children and Families, urge that we analyze this ban as merely a refusal of the government to subsidize indecent speech and as such not a subject of strict scrutiny. Brief of *Amici Curiae* at 12–20. Such analysis would, however, require us to go much beyond existing law in determining whether access channels qualify as subsidies and if they do whether their

*sui generis* nature as a communication media requires different standards from other subsidies. Neither party has raised this issue in those terms and, moreover, the government has conceded that the bans are unconstitutional if they involve state action. Therefore, we do not believe we are required to undertake such an alternative analysis, involving as it would many complex and as yet undecided constitutional questions in its own right.

thering that interest. Our conclusion as to the unconstitutionality of section 10's authorized denial of any access for indecent programming thus needs no further examination of other, less restrictive means, such as lockboxes, or segregation of indecent material with optional blocking at the subscriber's request. The ban falls under any application of the least restrictive means test.[16]

### B. Segregation and Blocking Requirement for Indecent Material on Leased Access Channels

Having found the authorization to ban indecent material from access channels unconstitutional, we turn now to whether the remainder of the indecency regulation passes constitutional muster. Since we believe that the segregation and blocking requirement as applied only to leased access channels is inadequately justified, we express no opinion as to the general viability of a segregation and blocking approach in regulating indecent material in the cable medium.

Petitioners charge, *inter alia*, that the segregation and blocking requirement impermissibly singles out leased access programmers for regulation, leaving indecent material on commercial channels and (as a result of our ruling) PEG channels unregulated. The government responds that any differential treatment present in the regulatory scheme satisfies the minimal standard of rational scrutiny to be applied in this case. *See* Respondents' Brief at 30. As we discuss below, the government misapprehends the applicable legal standard.

### 1. Underinclusiveness and the First Amendment

■ The Supreme Court has long recognized that the principles of equal protection and of the First Amendment are intertwined. *See Niemotko v. Maryland,* 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951); *Mosley,* 408 U.S. at 94–95, 92 S.Ct. at 2289; *Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980); *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 227–28 n. 3, 107 S.Ct. 1722, 1727 n. 3, 95 L.Ed.2d 209 (1987); *see also* 4 ROTUNDA & NOWAK, *supra,* § 20.11, at p. 48; Kenneth L. Karst, *Equality as a Central Principle in the First Amendment,* 43 U.CHI.L.REV. 20 (1975);

---

**16.** In addition to challenging the authorization of cable operators to ban indecent material, petitioners also challenge the regulations' authorization of cable operators to ban from PEG channels material that is "proscribed by law." *Implementation of Section 10,* 58 Fed.Reg. at 19,626 (to be codified at 47 C.F.R. § 76.702). Petitioners charge that the operator ban on material proscribed by law is an unconstitutional prior restraint and that the FCC improperly interpreted the underlying statutory language of section 10 which permits cable operators to deny PEG access to "material soliciting or promoting unlawful conduct." 1992 Act, § 10(c), 106 Stat. at 1486. For the reasons expressed in the text of this opinion, we believe that the authorization of cable operators to ban such material proscribed by law constitutes state action. The FCC appeared to concede at oral argument that should state action inhere in any ban involved in this case, such ban would contravene the First Amendment.

An examination of the PEG regulation itself also suggests constitutional infirmity. Even if we limited the regulatory language, which permits a ban on material "proscribed by law," to encompass only material that is constitutionally proscribable under *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430

(1969) ("constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action" (footnote omitted)), and *Hess v. Indiana,* 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (same), the ban could still be challenged as an unlawful prior restraint, because it lacks the proper safeguards required by the Constitution. "[A] system of prior restraint runs afoul of the First Amendment if it lacks certain safeguards: *First,* the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor. *Second,* any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo. *Third,* a prompt final judicial determination must be assured." *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 560, 95 S.Ct. 1239, 1247, 43 L.Ed.2d 448 (1975).

The absence of such safeguards is similarly evident in the Commission's authorization of cable operators to ban obscene material. *See* 1992 Act, § 10, 106 Stat. at 1486; *Implementation of Section 10,* 58 Fed.Reg. at 7993 (to be codified at 47 C.F.R. 76.701(a)); 58 Fed.Reg. at 19,626 (to be codified at 47 C.F.R. § 76.702). Since we are remanding other parts of the regulations to the FCC for other reasons, it will have ample oppor-

Geoffrey Stone, *Content Regulation and the First Amendment*, 25 WM. & MARY L.REV. 189, 201–07 (1983) (noting dangers of emphasizing equal protection in the area of free speech). Under both equal protection and First Amendment analyses, when a regulation aimed at alleviating a problem singles out only some persons contributing to the problem and not others who are similarly situated, the regulation is called "underinclusive." "All who are included in the class are tainted with the mischief, but there are others also tainted whom the classification does not include." Joseph Tussmann and Jacobus tenBroek, *The Equal Protection of the Laws*, 37 CAL.L.REV. 341, 348 (1949). *See also* MELVILLE B. NIMMER, NIMMER ON FREEDOM OF SPEECH § 2.06[B] (1984 & Supp.1992 (RODNEY A. SMOLLA, ED.)). In First Amendment cases that involve the differential treatment of speakers, "[a]s in all equal protection cases ... the crucial question is whether there is an appropriate governmental interest suitably furthered by the differential treatment." *Mosley*, 408 U.S. at 95, 92 S.Ct. at 2290 (citations omitted). *See also First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784–86, 98 S.Ct. 1407, 1420–21, 55 L.Ed.2d 707 (1978).[17]

While the Supreme Court has recently noted that the First Amendment does not pro-

hibit underinclusiveness *per se, see R.A.V. v. City of St. Paul, Minn.,* — U.S. ——, ——, 112 S.Ct. 2538, 2545, 120 L.Ed.2d 305 (1992), it has consistently applied two principles in examining the underinclusiveness of a restriction on speech. First, the Court has held that a restriction on speech may not single out a class of speakers on the basis of criteria that are wholly unrelated to the interest sought to be advanced. *See City of Cincinnati v. Discovery Network, Inc.,* — U.S. ——, ——, ——, 113 S.Ct. 1505, 1509, 1517, 123 L.Ed.2d 99 (1993) (holding removal of commercial newsracks in order to promote safety and aesthetics in violation of First Amendment because noncommercial newsracks posing identical problems remained unregulated); *Florida Star v. B.J.F.*, 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) (striking down prohibition on disclosure of sexual offense victims' names where prohibition applied only to instruments of mass communication); *Carey*, 447 U.S. at 465, 100 S.Ct. at 2292 (holding unconstitutional prohibition on residential picketing in part because exception for peaceful "labor picketing" was unrelated to asserted interest in promoting the privacy of the home). Second, the Court has consistently held that a restriction on constitutionally protected speech must—at a minimum—substantially advance

---

tunity to reexamine these remaining PEG ban issues.

**17.** While we might analyze this case solely under equal protection principles, we primarily apply First Amendment doctrine because of the centrality of the abridgement of petitioners' free speech. *Cf. Arkansas Writers' Project*, 481 U.S. at 227–28 n. 3, 107·S.Ct. at 1727 n. 3. Under the guarantee of equal protection, when legislating in the area of economic or social policy, the government is generally free to strike against an evil one blow at a time, *FCC v. Beach Communications, Inc.,* — U.S. ——, —— - ——, 113 S.Ct. 2096, 2101–02, 124 L.Ed.2d 211 (1993); *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949), but a legislative choice burdening the exercise of a fundamental right must pass strict scrutiny. *Plyler v. Doe*, 457 U.S. 202, 216–17 & n. 15, 102 S.Ct. 2382, 2395 & n. 15, 72 L.Ed.2d 786 (1982). While the freedom of speech is, of course, a fundamental right, *e.g., Grosjean v. American Press Co.*, 297 U.S. 233, 244, 56 S.Ct. 444, 446, 80 L.Ed. 660 (1936), courts have developed different standards for its restriction depending on the particulars of the speech or the type of regulation at issue. *Compare, e.g., Regan v. Taxation*

*With Representation*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (holding where contributions to lobbying organization were generally not tax exempt, exception for veterans organization was speaker-based discrimination not aimed at the suppression of ideas and satisfied rational scrutiny), *with Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585, 103 S.Ct. 1365, 1371, 75 L.Ed.2d 295 (1983) ("Differential taxation of the press ... places such a burden on the interests protected by the First Amendment that we cannot countenance such treatment unless the State asserts a counterbalancing interest of compelling importance that it cannot achieve without differential taxation." (footnote omitted)); *compare Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) (upholding fairness doctrine and right to reply requirement for broadcasting), *and FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (striking down restriction on editorializing by noncommercial educational broadcasting stations receiving federal funds) *with Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (striking down requirement that newspaper grant right to reply).

the asserted interest. *See FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (striking down ban on editorializing by noncommercial educational broadcast stations receiving federal funds where prohibition did not substantially promote asserted interest); *Bellotti*, 435 U.S. 765, 98 S.Ct. 1407 (same for prohibition on certain corporate speech). Thus the Court has invalidated restrictions on speech in cases where the differential treatment of speakers by a partial regulation remained unjustified in terms related to the asserted interest, or where the regulation did not substantially accomplish the asserted goal.[18] *See also Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 104–05, 99 S.Ct. 2667, 2672, 61 L.Ed.2d 399 (1979) (holding statute prohibiting newspapers from publishing juvenile defendant's name unconstitutional because, *inter alia*, in absence of regulation of electronic media it did not accomplish the stated purpose). *But see R.A.V.*, —— U.S. at ——, 112 S.Ct. at 2545 (underinclusiveness permissible where totally proscribable speech is at issue and there is no regulation of content) (dictum).[19]

## 2. Florida Star, Bellotti, *and* League of Women Voters

Applying those constitutional principles to this case, we find that section 10 singles out programmers on leased access channels for regulation, while leaving similar programmers on commercial channels unregulated. *Florida Star, Bellotti,* and *League of Women Voters* similarly involved content-based regulations that selectively applied only to some speakers while leaving identical speech uttered by others unregulated.

In *Florida Star,* the Supreme Court held that a statute prohibiting the publication of a rape victim's name was facially underinclusive because it applied only to "instrument[s] of mass communication," calling into question whether the law advanced the significant interests invoked by the state. 491 U.S. at 540, 109 S.Ct. at 2612 (internal quotes and citation omitted). The state was under an obligation to "demonstrate its commitment to advancing th[e asserted] interest by applying its prohibition evenhandedly, to the small-

---

**18.** Finding a regulation underinclusive need not imply that the government is surreptitiously attempting to further a different, unarticulated interest, but leads to the ultimate conclusion that the regulation, and in particular the classification employed, is not tailored to serve the compelling interest. *Accord News America Publishing, Inc. v. FCC*, 844 F.2d 800 (D.C.Cir.1988); *Community–Service Broadcasting of Mid–America, Inc. v. FCC*, 593 F.2d 1102 (D.C.Cir.1978) (en banc). Without impugning the legislative motive, a court may judge that because the interest asserted is not substantially furthered by the regulation "the 'sacrifice [of] First Amendment protections for so speculative a gain is not warranted....'" *League of Women Voters,* 468 U.S. at 397, 104 S.Ct. at 3126 (quoting *Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 127, 93 S.Ct. 2080, 2098, 36 L.Ed.2d 772 (1987)). *Cf. Minneapolis Star,* 460 U.S. at 592, 103 S.Ct. at 1375 ("We need not and do not impugn the motives of the ... [l]egislature. Illicit legislative intent is not the *sine qua non* of a violation of the First Amendment." (citations omitted)); *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.,* —— U.S. ——, ——, 112 S.Ct. 501, 509, 116 L.Ed.2d 476 (1991).

**19.** The Supreme Court recently noted in *R.A.V.:* There is no problem whatever, for example, with a State's prohibiting obscenity (and other forms of proscribable expression) only in cer-

tain media or markets, for although that prohibition would be "underinclusive," it would not discriminate on the basis of content.
—— U.S. at ——, 112 S.Ct. at 2545 (citing *Sable,* 492 U.S. at 124–26, 109 S.Ct. at 2835–36). The government's reliance on this passage for the proposition that indecent material may constitutionally be regulated on leased access alone is unwarranted. *See* Respondents' Brief at 29.
The cited passage from *R.A.V.* adds little to our case. First, the passage is dictum because *R.A.V.* held that the statute under review in that case did not pass constitutional muster. —— U.S. at ——, 112 S.Ct. at 2550. Furthermore, *R.A.V.* notes that the underinclusiveness of a regulation restricting "totally proscribable speech" need not be justified by reference to a neutral basis only "so long as the nature of the content discrimination is such that there is no realistic possibility that official suppression of ideas is afoot." *Id.* at ——, 112 S.Ct. at 2547. The case before us differs in both of these respects. Unlike the fighting words at issue in *R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2542, the "indecent" material at issue here is constitutionally protected speech, *Sable,* 492 U.S. at 126, 109 S.Ct. at 2836. Moreover, there is a much more realistic chance that official suppression of ideas is afoot in this situation, since access programmers tend to be a distinctly alternative voice to the mainstream media. *See* H.R.Rep No. 934, 98th Cong., 2d Sess. 30 (1984).

time disseminator as well as the media giant." *Id.* "[W]here a newspaper publishes truthful information which it has lawfully obtained, punishment may lawfully be imposed, if at all, only when narrowly tailored to a state interest of the highest order[;] ... no such interest [was] satisfactorily served by" the prohibition in *Florida Star. Id.* at 541, 109 S.Ct. at 2613. The publication of the victim's name in instruments of smaller, local communication appeared equally damaging to the government's asserted interest, and the regulation could not simply "be defended on the ground that partial prohibitions may effect partial relief." *Id.* (citations omitted). *See id.* at 541–42, 109 S.Ct. at 2613 (Scalia, J., concurring in part) (noting underinclusiveness should suffice for holding the prohibition unconstitutional).

In *Bellotti,* the statute prohibited specified business corporations from spending funds to publicize their views concerning a state income tax amendment. The Supreme Court affirmed the principle that the "legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue." 435 U.S. at 784–85, 98 S.Ct. at 1420 (citing *Mosley,* 408 U.S. at 96, 92 S.Ct. at 2290). In that case the state had argued, *inter alia,* that the statute protected corporate shareholders who did not want their resources spent on propagating views they did not hold. The Court noted that first, the statute restricted corporate speech only with respect to one kind of ballot question and did not apply to other corporate speech presenting the same trapped shareholder problem. *Id.* 435 U.S. at 793, 98 S.Ct. at 1424. Moreover, the restriction applied only to banks and not other organizations in which individuals may have a comparable membership interest. *Id.*[20] In other words, the statute at issue in *Bellotti* did not substantially advance the government's interest in protecting trapped shareholders. In striking down the statute, the Court concluded that even assuming the compelling nature of the government's interest in protecting the shareholder, there was " 'no substantially relevant correla-

tion between the governmental interest asserted and the State's effort' to prohibit" the corporation from speaking. *Id.* at 795, 98 S.Ct. at 1426 (quoting *Shelton v. Tucker,* 364 U.S. 479, 485, 81 S.Ct. 247, 250, 5 L.Ed.2d 231 (1960)).

*League of Women Voters* also struck down a restriction on speech that did not substantially advance the asserted interest. At issue was a prohibition on "editorializing" by noncommercial educational broadcasting stations receiving funds from the Corporation for Public Broadcasting ("CPB"). 468 U.S. at 366, 104 S.Ct. at 3110. As with section 10's exclusive focus on "indecent" speech, the prohibition in *League of Women Voters* was targeted at the content of the speech. *See id.* at 383, 104 S.Ct. at 3119. The government had argued that the ban was necessary first, to protect stations from becoming the government's "mouthpiece," and, second, to protect them from capture by private interest groups. The Court found that the first interest was not "substantially advanced" by the prohibition. *Id.* at 388, 104 S.Ct. at 3122. In partial support of that finding the Court noted that the regulation applied exclusively to local station editorials leaving unregulated CPB-funded *programs* which are distributed nationally and "truly have the potential to reach a large audience and ... have the kind of genuine national impact that might trigger" the purported government coercion that the regulation was aimed to prevent. *Id.* at 391, 104 S.Ct. at 3123. In other words, if the regulation were truly targeting the problem of government influence as a result of government funding, it could not consistent with the First Amendment single out for regulation editorializing by local broadcast stations receiving government funds, while leaving unregulated nationally distributed programs similarly receiving government funds. The statute did not substantially advance the first interest because it left unregulated the identical problem existing (more egregiously) in a different segment of the same medium. As for advancing the second interest, *i.e.,* preventing stations' capture by private interest

---

20. The Court also noted the statute's overinclusiveness because the statute prohibited corporate speech on the income tax amendment even when

expressly authorized by the shareholders. *Id.* 435 U.S. at 794, 98 S.Ct. at 793.

groups, the regulations were underinclusive as well "since the very same opinions that cannot be expressed by the station's management may be aired so long as they are communicated by a commentator or by a guest appearing at the invitation of the station during an interview." *Id.* at 396, 104 S.Ct. at 3125 (citation omitted). The second interest, therefore, was advanced little—if at all—by the statute. Section 10(b) similarly permits the same indecent material that is segregated and blocked on leased access channels to be transmitted without restriction on commercial channels which are often national and have a far greater audience.

### 3. *The Underinclusiveness of Section 10*

▮▮▮▮ The ultimate question surrounding a restriction on free speech remains, of course, whether the government's interest is compelling and "whether the statute—particularly the challenged classification—is narrowly tailored to serve that interest." *Community–Service Broadcasting of Mid–America, Inc. v. FCC,* 593 F.2d 1102, 1123 (D.C.Cir.1978) (en banc). However, as *Florida Star, Bellotti,* and *League of Women Voters* indicate, a content-based restriction on rights secured by the First Amendment must, at a minimum, substantially advance the asserted compelling interest and must explain the differential treatment in terms relevant to the interest asserted. Examining the legislative findings as we must, *see Sable,* 492 U.S. at 129, 109 S.Ct. at 2837 (" 'Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake.' ") (quoting *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 843, 98 S.Ct. 1535, 1543, 56 L.Ed.2d 1 (1978)); *League of Women Voters,* 468 U.S. at 387–88 n. 18, 104 S.Ct. at 3121–22 n. 18 (same), we find that section 10's exclusive focus on leased access for the regulation of indecent speech bears a limited relation at best to the goal of limiting children's exposure to "indecent" programming. Section 10 certainly does not substantially advance that interest, since the identical kind of programming may be transmitted freely on regular commercial channels.

The government argues that its regulation legitimately targets the "squeaky wheel" of indecency on cable access channels. Respondents' Brief at 29. The only evidence supporting the contention that leased access channels present a particular problem with respect to indecency is first, the Commission's assertion that because "no single editor control[s] . . . selection and presentation . . . on these channels, indecent programming may be especially likely to be shown randomly or intermittently between non-indecent programs," and second, Senator Helms' statements on the Senate floor invoking anecdotal evidence of exposure to sexually explicit material on leased access channels. *First Report and Order,* 8 F.C.C.R. at 1000 ¶ 15, 1001 ¶ 20 & n. 20. The FCC proffers no empirical evidence supporting the contention that leased access channels present a special problem of indecent programming that is absent from commercial channels. For example, it presents no evidence that indecent material on access channels takes viewers by surprise in a manner that regular commercial programming does not; there is no evidence that program guides are less helpful in the access context; no evidence regarding the relative prevalence, or severity of indecent material on leased access versus regular commercial channels; and no evidence indicating that children are more frequently exposed to indecent material on leased access channels than on regular commercial channels. Finally, while the Commission may be correct in noting that access channels, unlike pay channels, are part of the basic cable package and thus not individually invited into a customer's home, *see First Report and Order,* 8 F.C.C.R. at 1001 ¶ 20 n. 20 (quoting 138 CONG.REC. S646 (daily ed. Jan. 30 1992) (statement by Sen. Helms)); *see also* 138 CONG.REC. S648 (statement by Sen. Thurmond) (same), the same thing certainly is true of the commercial channels that make up the basic cable package and are unregulated by section 10. An indecent program would seem to be equally offensive whether transmitted on leased access channels or commercial channels. *Cf. Discovery Network,* —— U.S. at ——, 113 S.Ct. at 1514. In sum, the government has not yet sufficiently justified why free access by program-

mers should trigger the regulation of indecency.[21] As currently argued, free access "is not an acceptable surrogate for injury," *Florida Star,* 491 U.S. at 540, 109 S.Ct. at 2613; without further justification, the lack of regulation of commercial channels on the one hand and the regulation of leased access on the other, seems to be unadorned, unsubstantiated preference of one speaker over another.

By failing to address the problem of indecent material on regular commercial channels which represent the greater part of the cable medium and reach the same audience (in larger numbers), a serious argument can be made that the regulation selects programmers for regulation by a criterion (*i.e.,* leased access) unrelated to the asserted interest and that the resulting partial regulation does not substantially further the government's asserted interest. This would lead us to hold that the statute and implementing regulations are not narrowly tailored to serve the asserted interest. However, for reasons stated below, instead of striking down this part of the regulation, we remand the case to allow the FCC either to justify or to cure the underinclusiveness of the selective approach to the regulation of indecency represented by the remainder of the regulation after the total ban provision has been struck down. Should it decide to pursue the former path, it must explain the selective regulation of leased access channels in terms relevant to the government's asserted goal and determine the impact of the regulation on the accomplishment of the asserted interests. In so doing, the FCC may examine, *inter alia,* the relative prevalence and severity of and the relative exposure of children to indecent material on leased access channels.

### C. *Remand to the FCC*

The segregation and blocking requirements apply only to leased access channels. As enacted by Congress, section 10's regulation of indecency exhibited some measure of symmetry among leased access, PEG access and regular commercial channels, because the cable operator could eliminate indecent material from all three types of channels. We have held today that authorizing cable operators to ban indecent material from leased and PEG access channels is unconstitutional. Were this provision to be severed from the regulations, the remainder of the regulations would require indecent material on leased access channels to be segregated and blocked, while leaving PEG access and regular commercial channels free from any regulation. Moreover, while the cable operator would remain free to regulate indecent material on regular commercial channels, the cable operator is now absolutely prohibited from regulating constitutionally protected indecent material on PEG channels. In other words, were we to sever the segregation and blocking requirement, the result would be a regulatory scheme which singles out indecent material on leased access channels alone for regulation, seemingly without adequate justification. We are therefore reluctant to sever that part of the regulations authorizing a complete ban on indecent access programming from the blocked channel portion and to reach out to decide the constitutional issue presented thereby both as to underinclusiveness and as to the blocked access technique itself, without permitting the FCC to decide again if this is a desirable or feasible regulatory scheme.

" 'The cardinal principle of statutory construction is to save and not to destroy.' " *Tilton v. Richardson,* 403 U.S. 672, 684, 91 S.Ct. 2091, 2098, 29 L.Ed.2d 790 (1971) (plurality) (quoting *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 30, 57 S.Ct. 615, 620, 81 L.Ed. 893 (1937)). "The standard for determining the severability of an unconstitutional provision is well established: 'Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.' "

---

21. Of course even if the government's first contention were proven to be true, *i.e.,* that indecent material on access channels takes viewers by surprise because no single editor controls access channels, the FCC remains under an obligation to demonstrate that its regulation presents the least restrictive remedy for that problem. *Cf. League of Women Voters,* 468 U.S. at 395, 104 S.Ct. at 3125.

*Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684, 107 S.Ct. 1476, 1480, 94 L.Ed.2d 661 (1987) (quoting *Buckley v. Valeo*, 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976) (*per curiam* )) (internal quotes and citation omitted). The presumption of severability has been held to vary with the existence of a severability clause in the statute in question. *See Electric Bond & Share Co. v. SEC*, 303 U.S. 419, 434, 58 S.Ct. 678, 683, 82 L.Ed. 936 (1938) (severability clause reverses presumption of inseparability); *Carter v. Carter Coal Co.*, 298 U.S. 238, 312, 56 S.Ct. 855, 873, 80 L.Ed. 1160 (1936) (same). More recently, however, the Supreme Court has indicated a presumption in favor of severability regardless of the existence of a severability clause: "the unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted." *Alaska Airlines*, 480 U.S. at 685, 107 S.Ct. at 1480 (footnote omitted). *See id.* at 686, 107 S.Ct. at 1481 ("Congress' silence is just that—silence—and does not raise a presumption against severability") (citing *Tilton*, 403 U.S. at 684, 91 S.Ct. at 2098 (plurality) and *United States v. Jackson*, 390 U.S. 570, 585 n. 27, 88 S.Ct. 1209, 1218 n. 27, 20 L.Ed.2d 138 (1968)); *accord Regan v. Time, Inc.*, 468 U.S. 641, 653, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984). *But see Consumer Energy Council of America v. Federal Energy Regulatory Comm'n*, 673 F.2d 425, 442 (D.C.Cir.1982) ("We do not view the imposition of any unspecified burden on either side as beneficial to the inquiry."), *aff'd sub nom. Process Gas Consumers Group v. Consumer Energy Council*, 463 U.S. 1216, 103 S.Ct. 3556, 77 L.Ed.2d 1402, 1403, 1413 (1983); *accord Jackson*, 390 U.S. at 585 n. 27, 88 S.Ct. at 1218 n. 27 ("determination of severability will rarely turn on the presence or absence of" severability clause).

The analysis differs little in the context of invalidating provisions of regulations promulgated by an agency. *See, e.g., K mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294, 108 S.Ct. 1811, 1819, 100 L.Ed.2d 313 (1988). But where an agency is involved, a court need not strike down a regulation to effect a reconsideration by the issuing body. Thus, a court will issue a remand to the issuing agency if there is "substantial doubt" as to whether the agency intended its regulation to be severable. *North Carolina v. Federal Energy Regulatory Comm'n*, 730 F.2d 790, 795–96 (D.C.Cir.1984). Such a remand is often in the best interest of justice in that it allows the agency to reconsider the residue of its original regulation and keeps judges out of the business of administrators. *See Federal Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 73 S.Ct. 85, 97 L.Ed. 15 (1952) (overturning judicial severance of license conditions, remanding instead to FPC for new license determination in light of invalid provisions); *Addison v. Holly Hill Fruit Prods., Inc.*, 322 U.S. 607, 618–23, 64 S.Ct. 1215, 1221–24, 88 L.Ed. 1488 (1944) (overturning judicial construction of act and requiring instead Administrator to decide challenged definition anew in light of partial invalidation); *Sheet Metal Workers, Local Union No. 91 v. NLRB*, 905 F.2d 417, 422–24 (D.C.Cir.1990) (remanding case to NLRB to consider severability of unlawful clause in labor contract); *[Anonymous] v. Federal Deposit Ins. Corp.*, 617 F.Supp. 509, 518 (D.D.C.1985) (permitting agency to reconsider order in its entirety, giving it "the maximum possible freedom to tailor precisely any ... order necessary"). We are particularly reluctant to reach out and decide constitutional issues that might dissolve upon a remand to the issuing agency. *See Meredith Corp. v. FCC*, 809 F.2d 863 (D.C.Cir.1987). While we acknowledge that it is not within the jurisdiction of the FCC to declare an act of Congress unconstitutional, *Johnson v. Robison*, 415 U.S. 361, 368, 94 S.Ct. 1160, 1166, 39 L.Ed.2d 389 (1974), the Commission may take constitutional considerations into account when promulgating rules. The Commission might, for example, draw on other statutory authority to broaden its restriction on "indecent" programming so as to mitigate the underinclusiveness of its present regulation. We express no opinion on the existence of other sources of statutory authority and believe that it is best left to the expert interpretation of the agency in the first instance.

The Commission did at one point consider the constitutional ramifications of distinguishing between leased access and commercial channels when imposing the segregation

and blocking requirement. *See First Report and Order*, 8 F.C.C.R. at 1001 ¶¶ 18–20. However, the Commission's examination took place in the context of a broader regulation key parts of which have now been held unconstitutional. Its treatment of the "under-inclusiveness" issue in any case was somewhat cursory and we cannot readily transfer that rationale to a situation in which only *leased access* channels are now regulated and only in one particular way.

### III. CONCLUSION

Congress and the FCC sought to create a regulatory scheme in order to restrict children's exposure to indecent material on cable access channels. We do not denigrate its attempt to protect children. However, part of its execution in this case runs afoul of our Constitution. Congress and the FCC authorized private cable operators to ban indecent material from cable access channels in a manner that imbued those private cable operators with state action sufficient to trigger constitutional restrictions on their decision to ban indecent material. As a result, under our prior holding in *ACT II*, 932 F.2d 1504 (D.C.Cir.1991), the authorization of a complete ban on indecent material from access channels is unconstitutional under the First Amendment. The remainder of the regulation dealing with the blocked channel alternative would now apply only to leased access channels while leaving indecent material on regular commercial channels and (as a result of our decision) PEG channels unregulated. This selective regulation of leased access channels alone could itself run afoul of the First Amendment if children remain abundantly exposed to indecent material on other similar cable channels, and unless the selective restriction is justified in terms relevant to the government's asserted interest in imposing the requirement. Reluctant to rule on constitutional issues prematurely, we remand the case to the FCC for reconsideration of the underinclusiveness of the remaining regulatory scheme in light of our invalidation of the portions authorizing cable operators to ban indecent material from all access channels. The stays ordered are hereby continued pending completion of proceedings on remand.

*So ordered.*

