Madeleine ALTMANN, Michael Freeman dba Oranj Productions, Jennifer Locke, Rodney O'Neal Austin, Thomas Inouye, Daniel Kleman, John M. Kaman, and Kristin Atkins, on behalf of themselves and the general public, Plaintiffs,

v.

TELEVISION SIGNAL CORPORATION, dba Viacom Cable and/or Viacom Cablevision of San Francisco, a California Corporation, Defendants.

No. C 94–0071 VRW.

United States District Court, N.D. California.

March 30, 1994.

---

**1338**

Christopher P. Witteman, Susan D. Hyman, Law Offices of Christopher P. Witteman, David S. Kahn, San Francisco, CA, for plaintiffs.

Richard R. Patch, Jeffrey G. Knowles, Rachelle Desvaux, Coblentz, Cahen, McCabe & Breyer, San Francisco, CA, for defendants.

## BACKGROUND

CAULFIELD, District Judge.

Defendant Television Signal Corporation ("Viacom") is the monopoly provider of cable television services to approximately 161,000 households in San Francisco. Marx Decl., ¶ 2. The 1988 amendment of the franchise agreement between Viacom and the City of San Francisco provided that Viacom "shall continue to provide an opportunity for public expression by the continuation of ... *public access* on Channel 25." Witteman Decl., Exh. 1 at p. 5, § 2(a)(4). Viacom also is required, by federal statute, to provide a specified amount of *leased access* to its cablecasting system. *See* 47 U.S.C. § 532(b)(1).[1]

Plaintiffs produce public and leased access programs for broadcast on Viacom's system. Plaintiffs Locke, Austin, Inouye, and Kleman are producers of public access programming ("public access plaintiffs"). Locke and Austin produce a public access show called "Wax Lips." Kleman and Inouye produce a public access program called "Museo Contempo." Plaintiffs Altmann and Freeman ("leased access plaintiffs") are producers of a leased access program entitled "Erotica SF."

Public access plaintiffs allege that Viacom interrupted the transmission of their programs due to the sexual content of the programs. At the time, Viacom had issued a written policy stating that Viacom would "discourage obscene and indecent programming to the degree permitted by law" and

called for the immediate termination of any program containing genital nudity, "[t]he depiction of explicit sex," or "[a]ny simulation of explicit sex or genitalia." Freeman Decl., Exh. 2.

Recently, an episode of "Museo Contempo" was interrupted in the middle of its broadcast. Plaintiffs describe that episode as "a filmic meditation of relationships, sexual roles and politics, [consisting] in largest part of interviews with adults living in [San Francisco]." Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction ("Plaintiffs' Memo."), p. 4. Plaintiffs allege that the show was cut off because of a brief scene in which the abstract "outline of a couple enmeshed in a sexual embrace could be seen." *Ibid.* Viacom claims that the interruption was due to a technical problem and that Viacom acknowledged the error and re-broadcast the show in its entirety. Defendant's Opposition to Motion for Preliminary Injunction ("Opposition Brief"), pp. 6–7.

Similarly, plaintiffs Locke and Austin allege that a Viacom "playback technician" terminated an episode of their show "Wax Lips" midway through the broadcast. Plaintiffs claim that the show was interrupted after a "short stylized scene in which a non-erect penis was visible in a non-sexual context." Plaintiffs' Memo., p. 5. Plaintiffs were allegedly told that the show was cut because Viacom was "afraid of what was going to happen next." Locke Decl., ¶ 4.

Leased access plaintiffs have similar complaints of censorship by Viacom. In August 1993, leased access plaintiffs entered into a series of form agreements with Viacom to regularly broadcast leased access plaintiffs' show "Erotica SF." Plaintiffs admit that their show contains adult themes and sex-related subject matter, but contend that many segments of the public have lauded "Erotica SF" as "a well-produced and capable dissemination of sex education, opinion, and points of view not often heard on commercial television." Plaintiffs' Memo., p. 7. The first three episodes of "Erotica SF"

---

1. "Leased access" is defined as "channel capacity for commercial use by persons unaffiliated with the operator...." 47 U.S.C. § 532(b)(1).

were transmitted by cable without incident. The fourth episode was transmitted on November 17, 1993. On or about November 19, Viacom allegedly informed plaintiffs that the fourth episode contained indecent material in violation of the standard contract and all scheduled future telecasts of "Erotica SF" were therefore cancelled. Freeman Decl., Exh. 2. Viacom describes the fourth episode of "Erotica SF" as "hardcore pornography" containing "indecent" (and possibly "obscene") scenes depicting nudity and explicit sex acts. Opposition Brief, pp. 3–4.

On January 7, 1994, plaintiffs filed this suit for injunctive and declaratory relief alleging that Viacom's conduct violated the First Amendment of the United States Constitution. Plaintiffs also seek damages and other relief pursuant to 42 U.S.C. § 1983 and various pendent state claims. Concurrent with the filing of this complaint, plaintiffs moved the court for a temporary restraining order forcing Viacom to continue to broadcast plaintiffs' programs. The court denied the TRO because Viacom had a right to ensure that obscene materials were not disseminated on its system and plaintiffs had failed to "assure" or "certify" that their works were not *obscene*. Witteman Decl., Exh. 5, Transcript of TRO Hearing dated January 10, 1994, pp. 30–31. Provisional relief was denied on this ground alone. The court did not address the constitutionality of Viacom's conduct in allegedly censoring *indecent* speech in addition to obscene speech. *Id.* at 33.

After plaintiffs filed this suit, Viacom implemented a new policy regarding public and leased access broadcasts of obscene and indecent speech. Under this new policy, a producer must "certify" that the material to be telecast "is not obscene programming" and "is not indecent programming; namely, it does not describe or depict sexual or excretory activities or organs in a patently offensive manner as measured by contemporary community standards" before Viacom will broadcast the show. Marx Decl., Exhs. B and C. If the producer refuses to certify that the programming is not "indecent," Viacom will automatically assume that the program "does in fact contain indecent material or that the programmer desires to retain editorial discretion to include indecent material." *Ibid.*

Viacom plans to segregate "indecent programming" and broadcast it on one or more scrambled channels. Viacom will only unscramble the channels for a particular adult customer with the written consent of that customer before broadcast. *Ibid.* Viacom's leased access certification form also notes that "[r]ates for indecent programming shall include reasonable charges and expenses incurred by Viacom with respect to separation of such programming." Marx Decl., Exh. B at p. 2.

After the court denied plaintiffs' motion for a TRO, leased access plaintiffs submitted a certification to Viacom that "Erotica SF" did not contain any obscene material. Plaintiffs were unwilling to make the same certification concerning indecent material because they believed that Viacom's requirement of such a certification was unconstitutional.

Plaintiffs now move for a preliminary injunction enjoining Viacom from implementing its new segregation policy or otherwise exercising editorial control over non-obscene programming on its leased access or public access channels.

### DISCUSSION

A. *Standards for Preliminary Injunction.*

The traditional test in the Ninth Circuit for issuing a preliminary injunction includes consideration of four factors:

(1) The likelihood of the plaintiff's success on the merits;

(2) the threat of irreparable harm to the plaintiff if the injunction is not imposed;

(3) the relative balance of this harm to the plaintiff and the harm to the defendant if the injunction is imposed; and

(4) the public interest.

*State of Alaska v. Native Village of Venetie*, 856 F.2d 1384, 1388 (9th Cir.1988) (citing *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1200 (9th Cir.1980)).

■ These four factors have been collapsed into a two-prong test. To obtain injunctive relief, the moving party must show

either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions going to the merits are raised and the balance of hardships tips sharply in the moving party's favor. *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir.1987). These standards are not treated as two distinct tests, but rather as "the opposite ends of a single 'continuum in which the required showing of harm varies inversely with the required showing of meritoriousness.'" *Ibid.*, quoting *San Diego Comm. Against Registration And The Draft v. Governing Bd. of Grossmont Union High School Dist.*, 790 F.2d 1471, 1473 n. 3 (9th Cir.1986).

## B. *Analysis.*

█ In this case, a *partial* preliminary injunction is justified. Plaintiffs demonstrate that they are likely to succeed on their claims that total bans on indecent speech on leased and public access cable authorized by federal statute are unconstitutional. In light of current Ninth Circuit law, plaintiffs are unlikely to show that a federal statute and regulation requiring cable operators to segregate and scramble indecent material from leased access channels violates the First Amendment. Plaintiffs satisfy their burden of proving a possibility of irreparable harm.

When Congress passed the Cable Communications Policy Act of 1984, Pub.L. No. 98–549, 98 Stat. 2779 ("CCPA"), one of its goals was to assure that cable television provided "the widest possible diversity of information sources and services to the public." 47 U.S.C. § 521(4). To effectuate this purpose, Congress required cable operators to create "leased access" channels for commercial use by any entity not affiliated with the cable operator. 47 U.S.C. § 532(b). The CCPA also authorized franchising authorities such as the City of San Francisco to require cable operators to provide public access channels for public, educational, and governmental use. 47 U.S.C. § 531.

Public access and leased access channels were meant to serve as public forums, accessible to all interests, including those that may otherwise lack the resources to communicate through electronic media. See H.R.Rep. No. 934, 98th Cong., 2d Sess. 1984 U.S.C.C.A.N. 4655, 4667. To ensure free speech on public and leased access cable, the CCPA prohibited cable operators from exercising any editorial control over leased access or public access programs. 47 U.S.C. §§ 531(e), 532(c)(2).[2] The Act, however, did not grant leased or public access to material that was not protected by the Constitution. 47 U.S.C. §§ 532(h), 544(d). The CCPA also required cable operators to supply subscribers with a "lock box" that would allow the subscriber to "prohibit viewing of a particular cable service during periods selected by that subscriber." 47 U.S.C. § 544(d)(2)(A).

In 1992, Congress enacted the Cable Television Consumer Protection and Competition Act of 1992 (the "1992 Act"). Pub.L. No. 102–385, 106 Stat. 1460. Section 10(a) of the 1992 Act authorizes a cable operator to create its own policies to prohibit absolutely material that it "reasonably believed" was indecent from leased access channels.[3] Section 10(c) similarly authorized censorship of indecent material from public access channels, but only pursuant to regulations to be issued by the Federal Communications Commission ("FCC").[4] Section 10(b) directed the

---

2. Because the cable operator could not exercise editorial discretion over public or leased access programming, the CCPA granted the cable operator immunity from being sued for any access channel programming. 47 U.S.C. § 558.

3. Section 10(a) amended 47 U.S.C. § 532(h) to permit the cable operator as well as the franchising authority to regulate the transmission of obscene, indecent, or otherwise unprotected speech. The new provision further allowed "a cable operator to enforce prospectively a written and published policy of prohibiting programming that the cable operator reasonably believes describes or depicts sexual or excretory activities or organs in a patently offensive manner as mea-

sured by contemporary community standards [i.e., indecent material]."

4. Section 10(c) directed the FCC to "promulgate such regulations as may be necessary to enable a cable operator ... to prohibit the use ... of any channel capacity of any public, educational, or governmental access facility [*i.e.*, public access] for any programming which contains obscene material, sexually explicit conduct, or material soliciting or promoting unlawful conduct." The FCC interpreted the term "sexually explicit conduct" to mean "indecent material" as that term is described in Section 10(a). 58 Fed.Reg. 19623 (1993) (to be codified at 47 C.F.R. § 76.702) (Summ. of Second Rep. and Ord. at ¶ 10).

FCC to promulgate regulations to force segregation and blocking of any indecent leased access programming that the cable operator chose not to ban pursuant to its authority under Section 10(a).

Viacom relies on these three sections of the 1992 Act to justify its scheme of segregating all indecent public and leased access programming and requiring certification from the producer that the material to be shown on leased or public access cable is not indecent.[5] According to Viacom, the segregation and certification requirements with regard to the leased access channels are authorized by Sections 10(a) and (b) and the FCC regulations promulgated pursuant to Section 10(b). See 58 Fed.Reg. 7,993 (1993) (to be codified at 47 C.F.R. § 76.701). Viacom states that segregation and certification of programs on public access cable is authorized by Section 10(c) and its attendant FCC regulations. See 58 Fed.Reg. 19,623 (1993) (to be codified at 47 C.F.R. § 76.702).

Plaintiffs claim that all three sections and their implementing regulations violate the First Amendment and therefore Viacom has no statutory basis for its policies.[6]

Sections 10(a), (b), and (c), and the related FCC regulations were challenged as unconstitutional in *Alliance For Community Media v. Federal Communications Commission*, 10 F.3d 812 (D.C.Cir.1993) (hereinafter *"Alliance"*), *vacated pending rehearing en banc* (2/16/94). On April 7, 1993, and May 7, 1993, the District of Columbia Circuit stayed the FCC regulations promulgated pursuant to Sections 10(b) and (c) pending court review of the *Alliance* plaintiffs' claims. Witteman Supp.Decl., Exh. 6, at p. 8. On November 23, 1993, the three judge panel of the District of Columbia Circuit held that the outright ban of indecent material from leased and public access cable authorized by Sections 10(a) and (c) violated the strict scrutiny test under the First Amendment because it was not the least restrictive means of achieving the compelling interest of protecting children from viewing indecent material. *Alliance*, 10 F.3d at 817-24. The Court expressed concern that the leased access segregation requirement of Section 10(b) was underinclusive in violation of the First Amendment and the Equal Protection Clause because it singled out leased access cable for adverse treatment while leaving producers of material on other channels unregulated. *Id.* at 824-29. The *Alliance* court remanded the case to the FCC for reconsideration in light of Section 10(b)'s underinclusiveness. *Id.* at 829-31. The court continued the stay of the FCC regulations based on Section 10 until resolution on remand. *Id.* at 831. On February 16, 1994, the District of Columbia Circuit vacated its judgment filed on November 23, 1993, and granted a rehearing en banc. *See* Opposition Brief at Exh. B.

Despite the fact that the original *Alliance* decision was recently vacated, the opinion's underlying rationale for holding Sections 10(a) and (c) unconstitutional remains highly persuasive to the court for the

---

5. Viacom also argues that it has statutory authority outside of Section 10 to implement its segregation plan. These arguments, however, are unpersuasive. Viacom's argument that it was granted authority by the franchising authority to regulate indecent material pursuant to 47 U.S.C. § 544(d) fails because nothing in Section 544(d) authorizes the franchising authority to grant the operator the right to regulate indecent speech. That section *only* allows for regulation of "obscene or . . . otherwise unprotected" speech. Indecent speech is protected under the First Amendment. See *Sable Communications of California, Inc. v. Federal Communications Commission*, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989).

Viacom attempts to escape the prohibition against a "cable operator's" exercise of editorial discretion over public access material, see 47 U.S.C. §§ 531(e), 532(c)(2), by characterizing itself as an "agent" of the franchising authority and not a "cable operator." Similarly, Viacom relies on its claim of "agency" status with the City of San Francisco ("City") to state that it can exercise a franchising authority's power to regulate indecent material on leased access pursuant to 47 U.S.C. § 532(h). Viacom has pointed to nothing to convince the court that Viacom has anything other than a typical cable franchise relationship with the City. The evidence simply does not support Viacom's contention that it was the "agent" of the City with respect to regulating indecent leased access material.

6. Public access plaintiffs have an implied private right of action to enforce 47 U.S.C. § 531 against Viacom. *Missouri Knights of the Ku Klux Klan v. Kansas City, Missouri*, 723 F.Supp. 1347, 1354 (W.D.Mo.1989). Leased access plaintiffs have an express cause of action for injunctive relief against Viacom pursuant to 47 U.S.C. § 532(d).

purposes of this motion for preliminary injunction. There can be no doubt that indecent, non-obscene speech is fully protected by the First Amendment. *Sable Communications of California, Inc. v. Federal Communications Commission,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989). Section 10 regulates access programming based solely on whether it contains indecent material. Therefore, it is a content-based restriction, subject to strict scrutiny. *Alliance,* 10 F.3d at 822–23. Under the strict scrutiny test, the content-based regulation can survive only if it (1) promotes a "compelling" governmental interest, and (2) uses the "least restrictive means to further the articulated interest." *Sable,* 492 U.S. at 126, 109 S.Ct. at 2836.

While the need to protect children from exposure to indecent material is a compelling governmental interest, *ibid.,* a *total ban* on indecent leased or public access programming is not the least restrictive means of achieving that goal. Section 10(b) of the 1992 Act itself recognizes a less restrictive means of protecting children through segregation of indecent material to a separate channel, accessible only upon the affirmative request of the subscriber. Because Congress has stated that channel blocking is an adequate means of effectuating the government's compelling interest in protecting children, the absolute bans authorized by Sections 10(a) and (c) cannot satisfy the "least restrictive means" element of the strict scrutiny test.[7] *See Alliance,* 10 F.3d at 823–24.

 There is an argument that Sections 10(a) and (c) do not trigger First Amendment analysis because those provisions do not involve the government in direct censorship decisions, but simply allow "private" cable operators to ban indecent speech using their own "private" discretion. First Amendment guarantees protect against government action, and not private conduct. *Hudgens v. National Labor Relations Board,* 424 U.S. 507, 513, 96 S.Ct. 1029, 1033, 47 L.Ed.2d 196 (1976). The government's general regulation of a private industry is not

enough, in itself, to establish state action. *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 350, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974). The Supreme Court has stated, however, that state action may be found in the regulatory context if "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id.* at 351, 95 S.Ct. at 453. The government may be held responsible for the infringing decision of the private entity if it has "provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government]." *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982).

In this case, Sections 10(a) and (c) significantly encourage private cable operators to ban constitutionally protected indecent material from leased and public access channels. See *Alliance,* 10 F.3d at 818–22. The court agrees with the original *Alliance* decision that the immediate objective of the regulations, the context of the regulations, and the effect of the regulations create a sufficient "nexus" to find that the total ban on indecent material on public and leased access channels authorized by Sections 10(a) and (c) and their implementing regulations constitute state action. *Id.* (adopting the framework for analysis from *Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967)). The explicit purpose of the 1992 Act is to suppress the broadcast of indecent material on access channels.

The context of the regulation reveals the government's attempt to enlist the help of private cable operators to censor indecent material on access cable. In 1984, Congress stripped cable operators of any editorial control over constitutionally protected speech. 47 U.S.C. §§ 531(e), 532(c)(2). Sections 10(a) and (c), passed by Congress in 1992, allowed cable operators to bar indecent material from leased and public access cable. These sections are the only exceptions to the general

---

**7.** As the *Alliance* court noted, "[t]he total denial of access based solely on the fact that the content of the protected speech is 'indecent' raises the specter of 'reduc[ing] the adult population ... [to receiving] only what is fit for children' by permit-

ting and encouraging the cable operator to do just that. *Alliance,* 10 F.3d at 823 (quoting *Butler v. Michigan,* 352 U.S. 380, 383, 77 S.Ct. 524, 525–26, 1 L.Ed.2d 412 (1957)).

rule prohibiting a cable operator from exercising editorial discretion over protected access programming. This solitary government exception focuses the cable operator's attention on the material the government wishes to suppress and gives the operator the authority to ban the material entirely.

The ultimate effect of the regulation is to bar protected indecent speech from many public and leased access channels. As the *Alliance* court stated:

> The ultimate effect of this banning authorization is hardly in doubt; the legislative history indicates that many cable operators will eagerly ban indecent programming. See S.Rep. No. 92, 102d Cong., 1st Sess. 31 (1991). Under the statute and regulations, the cable operators have no incentive whatsoever to allow indecent access programmers onto leased access or [public] access channels. Of course the very reason for mandating access in 1984 ... was that unaffiliated programmers are unable to gain access to regular commercial cable channels.

*Alliance*, 10 F.3d at 821–22. For these reasons, the government can be assured that cable operators will institute bans on indecent material if only given the opportunity. Thus, Sections 10(a) and (c) appear to be a type of state action "whereby the [government] ... harness[es] the energies of private groups to do indirectly what [it] cannot [constitutionally] ... do [itself]." *Id.* at 822 (quoting *Reitman v. Mulkey*, 387 U.S. 369, 383, 87 S.Ct. 1627, 1635, 18 L.Ed.2d 830 (1967) (Douglas, J., concurring)).

For the reasons above, the court holds that plaintiffs have shown a likelihood of success on the merits on their claim that Sections 10(a) and (c) are unconstitutional and therefore, Viacom may not base its censorship policies on those sections of the 1992 Act. Because Section 10(c) is the sole source of Viacom's authority to regulate indecency on public access cable, public access plaintiffs

have shown an overall likelihood of success on the merits that Viacom's segregation of indecent material from public access cable violates the CCPA of 1984 and the First Amendment.

■ Leased access plaintiffs have the burden of showing that Section 10(b) or its implementing regulations, mandating segregation of indecent material from leased access channels, is unconstitutional or does not serve as a basis for Viacom's segregation policy. Plaintiffs make three arguments: (1) the segregation and scrambling policy is not the least restrictive means of regulation; (2) the District of Columbia Circuit's stay of Section 10(b)'s implementing regulations cancels Viacom's own segregation policy, as there is no basis under the law; and (3) certain aspects of Viacom's proposed censorship system violate the First Amendment.[8] The first two arguments are unpersuasive. The plaintiffs' arguments about the extent Viacom intends to charge the costs of segregating indecent speech from leased access cable to the producers of the indecent material, and Viacom's failure to provide adequate notice of the segregation to subscribers require discussion.

Plaintiffs claim that Section 10(b) and its implementing regulations are unconstitutional because they are not the least restrictive means of regulating indecent speech on leased access cable. Plaintiffs point to little current empirical evidence or case law to support their contention. Plaintiffs simply argue that the less restrictive method of relying on the use of parental "lockboxes" is sufficient to satisfy the compelling governmental interest in protecting children from being exposed to indecent material on leased access cable.

A "lockbox" or "parental key" is an electronic device that allows an adult to prohibit viewing of a particular cable service during certain selected periods. The device is capa-

---

**8.** Plaintiffs do not explicitly argue that Section 10(b) and its regulations are unconstitutionally underinclusive because they regulate only leased access. See *Alliance*, F.3d at 824–29. In any event, this court does not agree with this argument, as presented. The *Alliance* court held that "Section 10 certainly does not substantially advance [the government's interest in protecting

children], since the identical kind of [indecent] programming may be transmitted freely on regular commercial channels." *Ibid.* This court has no evidence to support the finding that other commercial channels are not as highly regulated or self-regulated. The court finds the underinclusiveness argument unpersuasive.

ble of blocking access to any channel including leased and public access channels and is "locked" by using a code or lockable switch at the rear of the converter. Freeman Decl., ¶ 9. Lockboxes are essentially "opt-out" devices that allow a subscriber to block indecent programming that would otherwise be broadcast into his or her home. In contrast, Viacom's segregation and scrambling method is an "opt-in" system. The indecent programming will be scrambled on a separate channel and a subscriber will have the option to unscramble that channel at little or no cost.

Plaintiffs present evidence that marginally supports their contention that "lockboxes" were once perceived as an effective way to protect children from indecent broadcast material. Plaintiffs' Supplemental Brief (As Requested By the Court) In Support of Preliminary Injunction ("Plaintiffs' Suppl. Brief"), pp. 7–9. Much of that evidence is irrelevant to the constitutional inquiry before the court because the evidence is almost a decade old. Since 1984, the cable medium has continued to expand and become more pervasive. It is rapidly becoming the broadcast medium of choice in American television households. "Out of a total of 92.1 million television households in the United States, there are approximately 55.7 million cable subscribers." *In The Matter of Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992—Indecent Programming and Other Aspects of Materials on Cable Access Channels,* First Report and Order, 8 F.C.CRcd 998 (2/1/93). Plaintiffs have not presented adequate evidence that lockboxes are sufficient to protect children from exposure to indecent material on television, in light of this growth, the inherent intrusiveness of cable television into the home, and its accessibility by children. Congress enacted Section 10(b) because it feels that the current "opt-out" system is insufficient to protect children.

The Ninth Circuit addressed the First Amendment implications of "opt-in" and "opt-out" systems in the context of the "dial-a-porn" regulations. *Information Providers' Coalition For Defense of the First Amendment v. Federal Communications Commission,* 928 F.2d 866 (9th Cir.1991). In *Information Providers',* the court upheld "re-

verse-blocking" restrictions limiting children's access to sexually-oriented telephone services. "Reverse-blocking" required the telephone carrier to block transmission of the indecent messages until a customer requested access. 928 F.2d at 869. Plaintiffs in that case argued that reverse-blocking was not the least restrictive means of regulating indecent phone services. Instead, plaintiffs suggested that "central blocking", whereby access is provided to all except those who affirmatively request blocking, was the least restrictive means of regulation. *Ibid.* After reviewing the evidence submitted by the parties, the Ninth Circuit upheld reverse-blocking as the least restrictive means of regulating indecent phone services. The court noted that central-blocking was simply not effective in protecting children from exposure to indecent material:

> A parent often does not request central office blocking until after the minor has consummated a call and the parent has discovered it on the telephone bill. Under such circumstances, the central office method, even where effective, does not completely bar or totally impede; from a practical standpoint, central blocking is invoked only after the minor's physical and psychological well-being have been damaged. Thus, the barn door is shut after the horse is gone.

*Information Providers',* 928 F.2d at 873. See also *Dial Information Services Corp. of New York v. Thornburgh,* 938 F.2d 1535, 1542 (2d Cir.1991) ("It seems to us that voluntary blocking would not even come close to eliminating as much of the access of children to dial-a-porn ... as would the presubscription requirement....").

The rationale of *Information Providers* and *Dial Information Services* applies to the regulation of indecent material in the cable medium as well. Cable television is at least as accessible and intrusive as telephone services—in fact, it is probably more accessible and more intrusive. Younger children can change the channels on a television set although they may not be able to look up and dial a particular "dial-a-porn" phone number. Plaintiffs have no persuasive evidence that an "opt-out" system is currently sufficient to protect children from exposure to indecent

material. The Ninth Circuit decision in *Information Providers'* convinces the court that plaintiffs have not raised serious questions that the segregation and scrambling requirements of Section 10(b) and its regulations are not the least restrictive means of regulating indecent material on leased access cable.

■ Plaintiffs and *amici curiae* American Civil Liberties Union and American Civil Liberties Union of Northern California, argue that Section 10(b) cannot serve as a basis for Viacom's authority to segregate indecent programming from leased access cable because the *Alliance* court stayed the implementing regulations issued under that section. The plaintiffs do not explain how the District of Columbia Circuit could have authority or jurisdiction to bind the Ninth Circuit or Viacom with its stay pending en banc review by the District of Columbia Court of Appeals, even though this court invited such briefing at the preliminary injunction hearing.

As a general rule, every Court of Appeals has jurisdiction to review final orders of the FCC. 47 U.S.C. § 402(a); 28 U.S.C. § 2342(1) ("The court of appeals has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the [FCC] made reviewable by section 402(a) of title 47. . . ."). Some FCC decisions, however, fall within the *exclusive* jurisdiction of the District of Columbia Circuit Court of Appeals. 47 U.S.C. § 402(b). The District of Columbia Circuit Court of Appeals has exclusive jurisdiction to review FCC decisions granting, denying, modifying, or revoking designated permits and licenses, and of cease and desist orders. *Ibid.*

The *Alliance* case is an appeal from an FCC determination that Section 10 and its implementing regulations are not unconstitutional. *Alliance* does not involve any of the matters listed in 47 U.S.C. § 402(b) over which the District of Columbia Circuit has exclusive jurisdiction. The Ninth Circuit has independent review authority over the constitutionality of the FCC regulations issued pursuant to Section 10. Therefore, the *Alliance* court does not have the power to bind the Ninth Circuit with its stay.[9] Plaintiffs have cited no authority indicating that Congress intended to grant the District of Columbia Circuit authority to stay the effect of a Congressional action affecting the entire country by simply staying the implementing regulations promulgated by the FCC.

■ Plaintiffs argue that Viacom is bound by the *Alliance* stay under the doctrine of collateral estoppel[10] because Viacom is a party to the *Alliance* litigation by virtue of its membership in the National Cable Television Association ("NCTA"), an intervenor in *Alliance.* This contention fails for two reasons. First, there is no evidence that Viacom actually authorized NCTA to represent Viacom in the *Alliance* case. *See Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1278–84 (9th Cir.1992). There is no evidence that NCTA is litigating *Alliance* on Viacom's behalf or that Viacom participated in that litigation in any way. *Contra Viacom International, Inc., v. Federal Communications Commission,* Case No C 93–1984 EFL, Order dated August 26, 1993, at 13–15 (N.D.Cal.1993).

Second, there is no evidence that the NCTA "adequately represented" Viacom in *Alliance. Class Plaintiffs,* 955 F.2d at 1283. *See generally Van Pool v. City and County of San Francisco,* 752 F.Supp. 915, 923 (N.D.Cal1990), *aff'd sub nom. O'Shea v. City of San Francisco,* 966 F.2d 503 (9th Cir. 1992).[11] Plaintiffs have yet to clarify the

---

9. The *Alliance* stay could prevent the FCC from affirmatively enforcing its regulation mandating a minimum segregation requirement on cable operators, but it would not prevent a private party in another circuit from relying on the regulation, which is the current law.

10. Plaintiffs cannot rely on the doctrine of res judicata because this case unquestionably does not involve the same cause of action alleged by the *Alliance* plaintiffs. See *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979) ("Under res judicata, a final

judgment on the merits bars further claims by parties or their privies based on the same cause of action.")

11. One treatise has stated: "The limits of association representation in these union and trade association cases must include at least the same protections against conflicting interests and simply inadequate litigation that apply in other settings." 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4456 at p. 490 (1981).

NCTA's litigation position in *Alliance*. As a third-party intervenor, NCTA could have entered the *Alliance* case for any number of reasons. In fact, it is not inconceivable that NCTA intervened in order to challenge the Section 10 implementing regulations or otherwise represent interests directly adverse to Viacom's current interests. Without more information regarding NCTA's position in that case, the court cannot give any weight to plaintiffs' collateral estoppel argument.

At this stage of the proceedings, plaintiffs have not raised serious questions with arguments based on the District of Columbia Circuit stay.

Viacom's system itself has a number of characteristics that, plaintiffs argue, make the system unconstitutionally restrictive. The first argument is that to the extent Viacom plans to make the producers of indecent speech on leased access pay for all the "reasonable" costs of segregating such programming from the leased access channel, Viacom's plan violates the First Amendment. Viacom has stated that it will not charge any of the added costs of segregation to its leased access or public access program providers or to its subscribers. Marx Supp.Decl., p. 4. Therefore, plaintiff cannot succeed on the merits of this argument.

■ The second argument is that Viacom must provide sufficient notice to its subscribers regarding the content and availability of segregated and scrambled channels. Viacom's segregation plan must include adequate notice to current and future subscribers describing the content and availability of the new channel(s) to make Viacom's plan the "least restrictive" means of regulation and therefore constitutional. Such a notice must, at a minimum, have the following general characteristics: (1) it must describe the content of the segregated and scrambled channels in an accurate and fair manner and the language of these descriptions must be carefully tailored to avoid creating an unnecessary "stigma" on the segregated channels; (2) it must be provided to all subscribers within a reasonable time upon the creation of the segregated channels; (3) it must be displayed in a prominent manner; and (4) it must inform subscribers that the channels will be unscrambled at their request at no cost.

■ The need for this type of notice is clear. Viacom must implement the "least restrictive" method of regulation. If the above notice is not provided, the broadcasters that have had their programs placed on the segregated channel risk losing their current viewers and are unduly inhibited from gaining a larger adult viewing audience. Plaintiffs have not made a showing to the court that Viacom will not comply with the adequate notice described by the court. The notice system and time for implementation described in Jonathan Marx's supplemental declaration in opposition to the motion for preliminary injunction meet the standards outlined by the court. Therefore, the plaintiffs' claims of a system which is unconstitutional because of its application by Viacom are without merit.

To the extent plaintiffs have shown a likelihood of success on the merits of their First Amendment claims, plaintiffs have also satisfied the irreparable injury requirement for a preliminary injunction. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976). Thus, in the Ninth Circuit, "a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Viacom International, Inc. v. Federal Communications Commission,* 828 F.Supp. 741, 744 (N.D.Cal1993) (citing *San Diego Committee v. Governing Board,* 790 F.2d 1471 (9th Cir. 1986)).

Public access plaintiffs are entitled to this presumption of irreparable harm because they have shown that Section 10(c), the solitary source of Viacom's authority to regulate indecent material on public access cable, likely violates the First Amendment. Any conduct Viacom takes pursuant to Section 10(c) will cause irreparable harm to public access plaintiffs' First Amendment rights.

Leased access plaintiffs have not even raised serious questions regarding the constitutionality of Section 10(b) and its regulations. Therefore, leased access plaintiffs are

not entitled to preliminary injunctive relief to prevent Viacom from complying with those federal laws.

### CONCLUSION

In sum, public access plaintiffs are likely to succeed in showing that Viacom has no authority to regulate indecency on public access cable and that any attempt to segregate indecency from public access is a violation of public access plaintiffs' First Amendment rights. Public access plaintiffs are therefore entitled to preliminary injunctive relief.

Leased access plaintiffs will likely succeed in showing that the total ban of indecent material on leased access cable authorized by Section 10(a) is a violation of the First Amendment. Viacom's authority to segregate and scramble indecent material from leased access cable must depend solely on Section 10(b) and its implementing regulations.

For the above reasons, the court hereby GRANTS plaintiffs the following preliminary injunctive relief:

1. Viacom is enjoined from *totally banning* indecent material from public access or leased access cable under the *Alliance* case analysis of Sections 10(a) and (c) of the Cable Television Consumer Protection and Competition Act of 1992.

2. Viacom is enjoined from attempting to segregate or otherwise utilize its editorial discretion to regulate indecent material on *public access* cable;

3. Viacom is enjoined from using its editorial discretion to regulate indecent material on leased access cable unless it is pursuant to Section 10(b) and its implementing regulations;

4. Pursuant to Federal Rule of Civil Procedure 65(c), plaintiffs shall post a total bond in an amount to be set by the court after counsel in this case meet and confer and recommend to the court jointly or separately the appropriate amount of the bond. The recommendation and supporting briefs, limited to 5 pages each, shall be filed with the court no later than April 7, 1994.

5. All equitable relief requested by plaintiffs, except the relief specifically granted in items 1, 2, and 3 above, is hereby DENIED.

IT IS SO ORDERED.